UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| DANIEL COKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   14-2093 |
| | ) |
| UNITED STATES POSTAL SERVICE, | ) |
| | ) |
| Defendant. | ) |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

Daniel Coker, a *pro se* litigant, filed this case against the United States Postal Service ("USPS") and the National Postal Mail Handlers Union (the "Union"). On February 12, 2016, the court granted summary judgment in favor of the Union and against Coker [101]. On the same date, the court entered an order [102] informing Coker and the USPS that it would take their cross-motions for summary judgment with the case, and set the matter for bench trial. The trial was held on March 30 and 31, 2016.

*Pro se* plaintiff, without counsel

As an initial matter, the court must address the fact that Coker proceeded *pro se* throughout this case. Coker told the court he had tried to engage several lawyers to handle his case but none was interested unless he could pay them. Coker did not have the money to do so. The court decided that trying to recruit counsel to represent Coker would not be fruitful. The United States Attorney represented the USPS, and made available all the witnesses Coker requested.[1] The United States Attorney compiled and labeled all exhibits that Coker said he would use at trial, and drafted several revised exhibit lists for him. When Coker could not find a labeled exhibit, the United States Attorney found a copy for him to use. The very high level of assistance and cooperation between the plaintiff and defendant in preparation for, and at, trial stands out in the court's experience as almost unprecedented. Court staff also helped Coker to organize exhibits. The court made procedural suggestions to Coker throughout the trial. The court also overruled most of the defendant's objections (for example, hearsay or foundation), and let everything come in. All exhibits offered at trial were admitted.

Judging from the documents written by Coker, one could conclude that he was unable to

---

[1] Coker requested the witness, former USPS employee Shawn Kempf, to appear at trial. Kempf's purported testimony would be to verify a conversation that Kempf had with another employee on the workroom floor. Coker would have offered evidence of the conversation to show a hostile work environment. For the reasons stated elsewhere in this order, Kempf's purported testimony would not have changed the outcome of the trial.

1

try the case himself. Indeed, in the order setting the case for trial [102], the court noted that Coker's summary judgment motion did not comply with the court's Local Rules to the point that it was difficult to make sense of his arguments. Coker's personal appearances were another matter. In person, the court observed that he was articulate, and he deftly handled examination and cross-examination of witnesses. He seemed to know what he was doing and how to get where he needed to go. The trial transcripts, d/e 163 and 164, reflect that Coker was quite competent to represent himself at trial.

## Issues for trial

In the order setting the case for trial, the court set out the claims to be tried. First, Coker alleged that the USPS breached a settlement agreement ("SA") dated September 16, 2010. He alleged that the USPS did this in two ways: (1) by looking back to 2005 to review his attendance records, despite the fact that the SA settled all matters related to his attendance prior to September 16, 2010; and (2) by submitting the SA in an arbitration proceeding.

Second, Coker asserted that the USPS denied him due process by failing to conduct a proper pre-termination interview, and failing to hand over all documentation at all relevant stages of the grievance procedure. Coker alleged that the USPS representatives and witnesses lied at the arbitration.

Third, Coker sought judicial review of an EEO appeal pertaining to the USPS's failure to do anything about a hostile environment. Coker argued that the USPS made it difficult, if not impossible, for him to show up for work regularly because his supervisors created a hostile work environment for him.

At a bench trial, the court is the trier of fact. *Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011). The court determines the weight and credibility of each witness's testimony. *Morisch*, 653 F.3d at 529. It was Coker's burden to prove his case by a preponderance of the evidence.

## Facts

Coker was a USPS mail handler at the Champaign, Illinois, mail processing facility from 2000 to 2012. He was a member of the National Postal Mail Handlers Union, subject to a collective bargaining agreement ("CBA") and the Employee and Labor Relations Manual ("ELM").

The ELM, Joint Exhibit 52-1, governs the USPS's expectations regarding attendance. Absences from work may be classified in a number of ways. The ELM, Section 511.4, addresses unscheduled absences, defined as "any absences from work that are not requested and approved in advance." Section 511.43 states, "Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences. In addition, employees must provide acceptable evidence for absences when required." Section 513.364 states, in pertinent part, that medical "documentation should provide an explanation of the nature of the employee's illness or injury sufficient to indicate to management that the employee was (or will

be) unable to perform his or her normal duties for the period of the absence.  Normally, medical statements, such as 'under my care' or 'received treatment' are not acceptable evidence of incapacitation to perform duties."    Section 665.41 states, "Employees are required to be regular in attendance.  Failure to be regular in attendance may result in disciplinary action, including removal from the Postal Service."

      Several witnesses testified about the distinction between "unscheduled absences" and "approved" or "disapproved" absences.  For every absence, a supervisor must approve some form of leave for record-keeping purposes, even if the leave is unpaid.  An absence requested in advance may be disapproved; then, if the employee is absent anyway, the supervisor must approve the form of leave taken by the employee.  The issue in this case is not whether the leave slips reflect "approved" or "disapproved," or whether Coker called in or was a no call/no show.  The issue is whether the absences were unscheduled.[2]

      The CBA, Section 16, sets out a progressive discipline procedure, consisting of (1) a letter of warning; (2) a suspension of less than fourteen days; (3) a suspension of fourteen or more days, and (4) discharge. A suspension of less than fourteen days is served on duty with no loss of pay; however, no-time-off suspensions satisfy the same step in the pattern of discipline. A suspension of fourteen days or more may, at the option of the USPS, be served as a no-time-off suspension.  An employee may grieve any discipline received.  Before any discipline is imposed, the employee is entitled to an opportunity for a pre-disciplinary interview ("pre-D").  *See* Jt. Ex. 1.

      Prior to September 2010, Coker was disciplined by the USPS.  On September 16, 2010, the parties signed the SA, resolving all matters to that point.  Early in 2011, Coker started to accumulate unscheduled absences.  Between February 2 and April 15, 2011,  Coker was absent 387.29 hours, or the equivalent of more than forty-eight work days.  A pre-D was held on April 15, 2011.  Coker stated that he was seeing a doctor for an unspecified medical condition, admitted that he had not submitted medical documentation but he expected to see the doctor soon, and he would probably have his doctor send a fax.  *See* Jt. Ex. 3. (Coker was ineligible for FMLA leave because, despite his status as a full-time employee, he had not worked the required 1,250 hours in the previous twelve months.) On April 25, 2011, Coker was issued a letter of warning for failure to maintain a regular work schedule due to unscheduled absences through April 15, 2011.

      After the pre-D but before Coker received the letter of warning, he had already taken

---

[2] A USPS Form 3971 is created when the employee is absent; sometimes the leave is approved on that form.  Other times, a second Form 3971 is created when a form of leave is approved.  For example, if an employee calls in and intends to use sick leave but has no sick leave available, a second form might be created to approve an absence without pay.  Supervisor Lou Borden also created, in Coker's presence, two forms for some of the absences – one to keep and one to give to Coker.  Two Form 3971s may legitimately exist for any given absence.  Coker has failed to prove any wrongdoing on that issue.

more unscheduled absences. From April 20 to May 13, 2011, Coker was absent 136 hours, or the equivalent of seventeen eight-hour days. A pre-D was scheduled for May 18, 2011, and again on May 23, 2011. Coker was a no-show for both. On May 31, 2011, Coker was issued a seven-day no-time-off suspension for failure to maintain a regular schedule and failure to provide documentation as requested. *See* Jt. Ex. 4.

Coker grieved the seven-day suspension. On July 15, 2011, Coker and the USPS settled the matter, with the suspension to remain in Coker's file for twelve months. At that time, if no further corrective action was implemented, the suspension would be removed from the file. In that time, however, Coker was required to be regular in attendance, with no more than nine instances of unscheduled absences. Coker was also required to provide documentation for any absence of three days or more, and failure to provide that documentation would be considered a breach of the settlement. If Coker violated any of the provisions in the settlement, he would be subject to the next level of progressive discipline. *See* Jt. Ex. 5.

Coker did not adhere to the conditions in the settlement. Between August 5 and October 30, 2011, he accumulated unscheduled absences totaling 368 hours, or the equivalent of forty-six eight-hour days. A pre-D was scheduled for October 25, 2011, and again on November 1, 2011. Coker was a no-show for both. On November 2, 2011, Coker was issued a fourteen-day time-off suspension for failing to maintain a regular work schedule and failure to provide documentation as requested. *See* Jt. Ex. 6.

Coker grieved the suspension, which was settled on January 5, 2012. The fourteen-day time-off suspension was changed to a fourteen-day no-time-off suspension. The suspension would remain in Coker's file for twelve months, and if no further attendance-related corrective actions were implemented and Coker was regular in attendance, the fourteen-day suspension would be removed from his file. *See* Jt. Ex. 7.

Three days prior to that settlement, however, Coker was absent. This absence is contested. Coker agrees he did not work that day, but contends that he thought the absence was approved, and in any event, it was his "holiday." Not counting that day, Coker had thirty-one unscheduled absences between January 2 and March 29, 2012. He was now facing discharge.

Coker's supervisor, Lou Borden ("Borden") held a pre-D on April 2, 2012. Coker was prepared for the pre-D. Borden asked Coker the following questions and noted his answers:

Do you dispute any of these absences? ***NO***

Do you understand the Postal Service Attendance policy, and the premise that all employees are to be regular in attendance? ***YES***

Do you understand the requirement that in order to be eligible for FMLA you must have worked 1250 hours in the previous year? ***YES***

Is there any reason as to why I should not issue you corrective action? **At that time you did not respond but handed me a typed statement regarding a hostile work environment which you did not sign.** [The typed statement is Joint Exhibit 63.]

On April 12, 2012, Coker was issued a notice of removal for failure to maintain a regular work schedule, stating that he would be removed no sooner than thirty days after his receipt of the notice. *See* Jt. Ex. 2. The notice of removal was later amended to specify an effective date of May 15, 2012. *See* Jt. Ex. 8.

The collective bargaining process is comprised of four steps. The grievant initiates the grievance at Step 1. If the grievance is denied, the Union pursues the grievance at Step 2. If the result is unfavorable, the Union decides whether to take the grievance to Step 3, and if necessary, to Step 4, which is binding arbitration.

Coker commenced Step 1 through Union representative Kurt Reifsteck. The Step 1 grievance was denied on or about April 26, 2012. The denial noted that Coker had been given more than enough opportunity to improve his attendance problems. *See* Jt. Ex. 53-7.

Four days after the Step 1 denial, Coker obtained a doctor's note stating, "Patient was seen in our office on 3/7/12 and 3/20/12 for anxiety and depression. Patient's condition is stable at this time." *See* Jt. Ex. 62. The dates in the doctor's note did not correlate to any specific absence listed in the notice of removal, and did not comply with the requirements specified in the ELM, § 513.364.

The Union representative proceeded to Step 2. The doctor's note was apparently incorporated into the Step 2 materials, as was another letter written by Coker in which he complained about the harassment at work. *See* Jt. Ex. 64. The Union argued at the Step 2 meeting that the reason for the absences was the "work environment and supervisory;" specifically, discussions between supervisors and other workers on the workroom floor regarding Coker's discipline, which "creates a hostile environment, adding anxiety and embarrassment causing him to miss work." The USPS noted that there is a process to follow regarding harassment, and Coker did not have any witness statements to back up his claims. The USPS reviewed Coker's attendance from past years to see if different supervision had any impact on his attendance, but Coker had very poor attendance each year going back to 2005. The Step 2 grievance was denied on May 25, 2012. *See* Jt. Ex. 13.

The Union proceeded to Step 3. The Step 3 denial was issued on July 23, 2012. *See* Jt. Ex. 52-2, pp. 5-6. The Union proceeded to Step 4, binding arbitration. The arbitrator's award, dated February 12, 2013, concluded that there was just cause to remove Coker for failure to maintain a regular work schedule. *See* Jt. Ex. 9.

### Breach of the September 16, 2010, settlement agreement

Coker claims that the September 16, 2010, SA was breached in two ways. First, he contends that the USPS used his prior attendance history against him when it decided to

terminate him, which he argues is contrary to the terms of the SA. Second, he claims that the SA was breached when the USPS presented the SA in the arbitration.

In the SA, Joint Exhibits 11 and 12, Coker and the USPS agreed to settle all of Coker's "litigation, claims, complaints, appeals, grievances, proceedings or causes of action of any kind that Mr. Coker had, has or may have, known or unknown, . . . up to and including the effective dates of this Agreement, including all claims relating to any aspect of [Coker's] employment with the [USPS]." The SA also contained an integration clause: "All agreements and understandings of the parties are set forth herein and no other agreement between said parties shall be binding unless in writing and signed by the parties hereto. . . . This Agreement may not be cited for any purpose by any third party not in privity with the parties to such Agreement." The SA was signed by Coker and a representative of the USPS.

Coker asserts that the SA is a complete bar to consideration of *any* matters prior to September 16, 2010. Therefore, by looking back to 2005 to see if his supervision had an effect on his attendance, the USPS breached the SA.

A similar issue arose in *Bell v. Potter*, 2001 WL 1636888 (N.D. Ill. Dec. 20, 2001). In *Bell*, the plaintiff applied for a job with the USPS, and believed he was not hired because of his race, color, sex, and age. *Bell*, 2001 WL 1636888, at *1. The plaintiff and the USPS mediated the dispute and negotiated a settlement agreement restoring the plaintiff's name and test score to "the carrier's register. The agreement also required the USPS to 'consider [the plaintiff] for employment when his name reaches the register[.]'" *Bell*, 2001 WL 1636888, at *1. The agreement also contained an integration cause, "There are no other terms or conditions of this agreement which are not expressly contained herein and none will be implied." *Bell*, 2001 WL 1636888, at *1. The plaintiff was later interviewed for a letter carrier position but was not hired. *Bell*, 2001 WL 1636888, at *2. The plaintiff claimed that the USPS breached the settlement agreement by considering matters resolved during the mediation. *Bell*, 2001 WL 1636888, at *5. The court noted that there was no language in the settlement agreement barring consideration of other matters in the hiring decision. *Bell*, 2001 WL 1636888, at *5.

In *Bell*, the court found that because the agreement as written was unambiguous, "Bell's own thoughts on what the agreement meant are immaterial." *Bell*, 2001 WL 1636888, at *5. More to the point, the court found the integration clause to be an explicit manifestation of the parties' intent that the settlement agreement be interpreted according to the language therein. *Bell*, 2001 WL 1636888, at *6.

The court disagrees with Coker's contention that the SA prevented the USPS from looking at his attendance prior to September 16, 2010. Coker claimed his attendance record leading to the Notice of Removal was caused by his supervisors creating a hostile environment, which led him to become anxious about going to work. Jennifer Defebaugh testified that at the time of Coker's removal, she was the "newest, most objective party" and wanted to compare his recent attendance to "a time when his attendance was good and see if it's related to his supervisor." Defebaugh Trial Test., p. 300-302. She only looked at his unscheduled absences,

6

not any discipline imposed. She concluded that, each year going back to 2005 when he had different supervisors, Coker had a record of very poor attendance due to unscheduled absences.

The settlement agreement was not breached by Defebaugh's review of Coker's attendance records. Moreover, her review was not an attempt to discipline Coker for absences encompassed in the SA; it was her way of investigating his allegations of a hostile environment caused by his supervisors.

Also, the USPS did not breach the SA by introducing it as evidence in the arbitration. The list of arbitration exhibits shows that the USPS did not introduce the SA; the Union did. *See* Jt. Ex. 54.

Coker has not proved his claim of breach of the SA.

Due process

Coker contends that he was not afforded due process prior to his termination.

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) and its progeny mandate that prior to termination from public employment, the employee must be given "a pretermination opportunity to respond, coupled with post-termination administrative procedures." *Loudermill*, 470 U.S. at 547-48. "The nature and extent of the process a public employee is due before termination depend on the adequacy of any post-termination hearing that was available." *Carmody of Bd. of Trustees of Univ. of Ill.*, 747 F.3d 470, 474 (7th Cir. 2014) (citing *Loudermill*, 470 U.S. at 545-46). When the employee has a full opportunity to contest his removal in post-termination proceedings, all that is required pre-termination is "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Carmody*, 747 F.3d at 475 (citing *Loudermill*, 470 U.S. at 546). "The purpose of requiring notice of pre-termination proceedings is to permit the employee to gather his thoughts about the allegations against him and formulate a response." *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 399 (7th Cir. 2015). The opportunity to respond is simply that; there is no guarantee that the employer will credit the employee's version of events.

Coker was given several days' notice of his pre-D. He had an opportunity to gather his thoughts, as evidenced by his typed statement. He knew or should have known that the issue would be unscheduled absences, as he'd been disciplined progressively for that issue over the previous twelve months, to no effect. At the pre-D, he did not dispute his absences, and knew the regulations applicable to unscheduled absences. Also, Coker had a full post-termination opportunity to contest his removal through the grievance procedure. His pre-termination proceedings are entirely consistent with *Loudermill* and its progeny.

Coker contends that he did not have a meaningful opportunity to respond because Borden had already decided to terminate him before the pre-D, and his supervisors had been telling other employees that they were going to terminate Coker. At two points in the progressive discipline, Coker negotiated a settlement that allowed the discipline to be rescinded if he changed his ways,

7

but he did not do so.  It seems logical and likely that supervisors would have said things about his attendance, and that other employees would have said things as well.  That is obvious when the evidence of the consequences of Coker's unscheduled absences is considered.  When unscheduled absences occur, the remaining workers have to work overtime, others have to perform duties that are not theirs, and/or the supervisor has to call in additional personnel to do the work of the absent worker.  It would be remarkable if coworkers were not asking supervisors, "How many chances does Coker get?"[3]

Coker also points to the fact that Borden testified at trial that after the pre-D he thought about the Notice of Removal for a weekend before deciding to issue it, but Roxanna Keyes indicated in an email three days after the pre-D, "Coker – [pre-D] for removal conducted on Monday.  Letter being prepared."  At trial, she testified, "so I assume that means [Borden] was in the process of preparing the removal letter at that time," and by Thursday, April 5, " he's made a decision." Keyes Trial Test., pp. 375-76.  Coker claims that this shows obfuscation on the part of USPS officials, and asks the court to draw a negative inference. But the testimony is not necessarily inconsistent.  Borden testified that he knew Coker needed to be disciplined, but considered whether something short of removal was warranted.  The Notice of Removal was issued seven days after Keyes said the letter was being prepared.  Borden could have decided *months* prior that Coker should be removed but still wanted to think about it.[4]

---

[3] Coker also claims that the USPS violated due process by issuing the Notice of Removal, which was punitive instead of corrective, in violation of the ELM.  He asserts that the USPS should have talked to him about his unscheduled absences instead of allowing them to accumulate to a point leading to removal.  Apparently Coker regards the multiple levels of progressive discipline and Step 2 settlements prior to the Notice of Removal as something other than corrective.  Coker also takes issue with Labor Relations Specialist Muskopf's opening statement at arbitration.  Whether his misstatements were intentional or not, opening statements are not evidence.  (This is a standard jury instruction in all trials.)  Opening statements are merely roadmaps to show where the party intends to go with the evidence.  The arbitrator looked at the *evidence* and rendered a decision.  No harm came to Coker from Muskopf's opening statement.

[4] The email and Keyes' testimony show that, at that time, the USPS district that included the Champaign facility was under some pressure to curtail unscheduled absences.  Keyes testified that about one month prior to the April 5 email, the district finance manager began biweekly "telecons" with plant managers or their representatives who were expected "to answer for any employee that came up as on the list of having too many unscheduled absences . . . because it is very expensive for the post office when people have unscheduled leave." Keyes Trial Test., pp. 374-75.  Several USPS employees discussed the disruptions in the workplace caused by unscheduled absences.  The Champaign mail processing and distribution facility took in mail from cities and towns with zip codes beginning with 617, 618, 619 and 624, sorted it, and sent it out to other facilities, handling as many as 3 million pieces of mail on Coker's shift.   Mail handlers such as Coker are responsible for moving mail to and from the loading docks and around the facility.  Defebaugh testified that other USPS workers are represented by a different

Coker argues that he was deprived of due process because the USPS totally disregarded his side of the story, and the concurring official did not see his statement before he signed off on the discipline to be imposed. However, the concurring official could read in the Notice of Removal that Coker had submitted a statement about workplace harassment, and if he had thought it to be relevant, he could have asked to see the statement. Due process is not violated by virtue of a decision against the employee. Again, the issue is whether Coker had numerous unscheduled absences, and both Borden and the concurring official agreed that he did. Coker admits that his attendance was poor; his reasons were not relevant to USPS officials, and the law does not require leniency.

Coker has not prevailed on his due process claims.

### EEO appeals

The third and final issue is Coker's EEO appeals. They all relate to his claim of harassment and a hostile environment. Specifically, he complains that supervisors told others about how Coker was going to be terminated, denied him the chance to put his name on the "overtime desired" list, and failed to investigate when he complained to his supervisors. (He presented no evidence regarding a supervisor's falsehood to the Illinois Department of Employment Security; therefore, that issue is deemed waived.)

A hostile environment is one that is permeated with hostility, abuse, intimidation, ridicule, or insult that is sufficiently severe or pervasive. *Boss v. Castro*, 2016 WL 1073239, at *7 (7th Cir. Mar. 18, 2016) (discussing hostile environment under Title VII). Coker claims that a hostile environment existed, and the USPS did not investigate the problem.

As noted earlier, it is not surprising that supervisors may have talked to others about disciplining Coker. Other mail handlers not only noticed, but were negatively impacted by his poor attendance. It is understandable that coworkers could ask why Coker wasn't held to the provisions of the ELM, if only to see what they, too, could get away with. Defebaugh testified about having to enlist postal workers in other unions to help the mail handlers when Coker was absent. Any talk between supervisors and coworkers was not harassment, nor was it a hostile environment. Rather, it was an outgrowth of Coker's poor attendance. The USPS showed remarkable restraint and patience regarding Coker's numerous unscheduled absences, which would be apparent to anyone there. A few random remarks do not constitute harassment or a hostile environment.

At trial, Coker testified that his supervisor, Kempf, mocked him on the workroom floor "a couple of times" in 2011, for having anxiety. Supervisor Borden came to the loading dock on January 6, 2012, and "rather aggressively and loudly" asked Coker about taking off January 2.

---

union, and when there are too few mail handlers on shift, they have to decide whether to "let the mail sit or talk to the other union and say we have no choice but to have clerks go take that mail because we don't have anybody to bring it to you." Defebaugh Trial Test., pp. 320-25.

9

Coker also claims that Borden was "very hyper and excited" and tried to have the pre-D on March 30, 2012, when it was actually scheduled for April 2, 2012. He also claimed that Borden, Kempf, and another individual "would all say hateful things" and treated him with little respect. They would use words that were "very short and aggressive" with him. Those conclusory statements are insufficient to show either harassment or a hostile environment.

The only evidence Coker presented regarding his not being placed on the "overtime desired" list is an email dated well after Coker was terminated, that referred to an EEO complaint Coker had made on that issue. No evidence was presented as to when, where, or why he was not placed on the list, or who prevented it from happening. The court will not speculate whether his numerous unscheduled absences had anything to do with it.

Coker's claim that supervisors did not investigate harassment or a hostile environment also fails. Keyes and Defebaugh dispute that assertion. Keyes stated that when Coker complained to her about Kempf bragging on the workroom floor that Coker would be disciplined, she talked to Kempf, Borden, and Mary Mazzella, and also to the Union rep, Reifsteck, and then asked around the floor trying to find out if any other employees knew anything because "floor talk is a very big thing in a plant." Keyes Trial Test., p. 371. She learned nothing, but decided to give Coker the benefit of the doubt. Keyes needed to reallocate supervisors and staff throughout the facility and decided to address the problem by reassigning Coker to report to Borden instead of Kempf. Defebaugh attempted to get statements from anyone about Coker's claims of harassment, but could find no witnesses. She decided to test his allegations by looking back to his attendance records from years past.

Coker claims that no investigation was done, and submits pages of affidavits from Borden and Kempf relating to an EEO investigation, in which they say no prior investigation was done or that they were unaware of any investigation. Coker seems to have expected an Investigation (with a capital "I"), but his expectation is irrelevant. Keyes states she investigated by talking to people other than Borden, Kempf, or Coker. Defebaugh investigated at the Step 2 grievance stage. She could find no witnesses to any harassment or hostility. Coker was unaware of what Keyes and Defebaugh did, but it does not mean that they failed to investigate.

Summary

To come directly to the point, the court finds that none of Coker's claims are supported by the evidence. During 2011 and 2012, the USPS and the Union strictly followed the conditions of the CBA. The CBA provided for four steps of progressive discipline, and grievance procedures.

There is nothing in the evidence to suggest that USPS did anything but follow the conditions and terms of the CBA. Coker has argued that, in terminating him, the USPS did so for his prior conduct up to and including 2010. That is transparently inaccurate. Coker was terminated for his course of conduct in 2011 and 2012, notwithstanding the warnings and progressive discipline that had been imposed.

The same thing can be said about Coker's claim of denial of due process.  He had at all times the full enjoyment of all the process that was due. Specifically, the  procedures that resulted at first in compromise and additional opportunities to correct his conduct.  The procedures culminated in binding arbitration in favor of the USPS.

Finally, Coker complains that the USPS created a hostile work environment.  Assuming without deciding that supervisors make negative remarks about Coker's absences, that is hardly a hostile environment.  It seems logical and likely that supervisors would have said things about his attendance.  That is obvious when the evidence of the consequences of Coker's unscheduled absences is considered.  Moreover, when asked on the witness stand to articulate specifically what he meant by a hostile work environment, Coker's conclusory statements suggest that they were not very nice to him.  Of course, what could he expect?  His supervisors and coworkers were rightfully frustrated with his unscheduled absences.

Coker has painstakingly pointed out every inconsistency in the documents and the witnesses' testimony to show that the USPS was out to get him.  However, even if the court were to draw that conclusion, it does not change the outcome of the case.  The USPS handled everything according to the rules. Coker had too many unscheduled absences, failed to heed warning after warning, and after he was terminated, his post-termination proceedings could not save him from himself.

That takes care of all Coker's claims except damages.  Since there is no liability, the court may not consider damages.

The truly exceptional thing about this case is the restraint and moderation shown by the USPS and the equally exceptional representation by Coker's Union in dealing with his unscheduled absences.  There is a total lack of merit in any of Coker's complaints about his treatment by the USPS or his Union.

IT IS THEREFORE ORDERED THAT:

1. The Clerk enter judgement in favor the defendants, and each of them, and against the plaintiff. The parties shall bear their own costs.

2.  All pending motions are moot.

3.  If Coker feels he has been wronged by the court's decision herein, he is at liberty to appeal the court's ruling in accordance with the procedure and time specified in Federal Rule of Appellate Procedure Rules 3 and 4.

    4.  This case is terminated.

Enter this 3rd day of May, 2016.

**s/Harold A. Baker**

———————————
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE